IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TED D. HARDESTY,

       Plaintiff,

      v.                                                                      CIV 03-1114 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.

# **MEMORANDUM OPINION AND ORDER**

      Plaintiff Ted Hardesty previously worked as a welder, oil field laborer, roughneck, cook, and convenience store clerk and stopped working in 1996. He applied for benefits just before his forty-fifth birthday, alleging that he became disabled in 1996 due to pinched nerves in neck, which caused spasms, numbness, tingling, and restricted mobility in arms, as well as due to leg, knee and foot swelling from arthritis, which caused pain and restricted mobility. He would later add depression, anxiety, and breathing problems as disabling conditions. S*ee, e.g., Administrative Record* ("*Record*") at 63, 114-15, 103-05, 113-122, 133-141, 152.

      After holding a hearing, Administrative Law Judge Gerald R. Cole secured additional evidence from two consulting examining sources. He subsequently held a second hearing and found that Plaintiff has the residual functional capacity for a limited range of light work. With the aid of the testimony from a vocational expert, ALJ Cole identified three light unskilled jobs Plaintiff can perform – food deliverer, cashier and arcade attendant – and denied benefits at Step 5 using the Medical-Vocational Guidelines as a framework. *See id.* 15, 18, 20, 36-79, 153-54.

The Appeals Council declined review on August 8, 2003, thereby rendering the ALJ's decision final. *Id.* at 5-7.

This matter is before the court on Plaintiff's Motion to Reverse or Remand, where he asserts that the ALJ committed three errors. *Doc. 9.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. *See Docs. 4, 5.* The entire record having been read and carefully considered, I find that Plaintiff's motion should be denied and the decision of the Commissioner affirmed.

## I.  Standard of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

## II.  Relevant Factual Background

In support of his argument that he suffers a physical disability due to degeneration of his cervical spine, Plaintiff relies upon three things:  his testimony, the report of a consulting physician, and the results of an MRI.

According to the medical records, Plaintiff complained of pain and numbness two months prior to filing his June 2000 application. *See., e.g., Record* at 168, 165. X-rays of Plaintiff's cervical spine revealed

> cervical vertebrae with no evident fracture or spondylolisthesis. Kyphosis[1] is seen. The posterior cervical line is intact. There is some straightening of the cervical vertebrae with loss of the lordotic curve. There is narrowing of the C4-C5 and C5-C6 disc spaces with anterior and posterior osteophyte formation. . . . No offset of C1 or C2 or displacement of the prevertebral soft tissues.

*Id* at 170. Hardesty was subsequently treated with a variety of medications for pain. *See e.g., id.* at 119, 163-64.

After applying for benefits, Plaintiff indicated on his July 2000 daily activities report that although his cervical spine problems limited his ability to do things that required lifting, pulling, and some forward bending postures, he was able to take care of all of his personal needs, cared for four pets, shopped, drove, cooked and went for walks.[2]

Prior to the initial denial of his claim, the Administration sent Plaintiff to consulting

---

[1] "Kyphosis: Outward curvature of the spine, causing a humped back. Treatment is by physical therapy and wearing a back brace, and in some cases by surgery." www.medterms.com.

[2] Hardesty considered cooking a "hobby." He described a typical day: "fix morning coffee, take my meds, help get the wife's lunch put together. Sometimes I drive her to work (50 miles one way) on these days I pay bills and pick up what supplies we need come back home fix supper. Take care of our pets 2 cat 2 dogs. I retrieve mail." *Record* at 127. He also indicated that "I usually cook the meals . . . I do laundry 2 hours wk[,] cooking about 2 hrs a day. *Id.* at 128. He prepared meals "lunch & supper[,] weekends breakfast . . . I camp when I can once a month. . . . I walk to the mail box once a day. It's about 2 hundred yards. I usually rest about ½ way back." *Id.* at 129; *see also id.* at 130. He could shop and put groceries away, drive, and did not need assistive devices. *Id.* at 130. H could also button clothes, pick up pencils, write letters, pick up coins, tie shoes and zip pants. *Id.* at 131.

The pain in his neck and shoulders and dizziness he felt when he leaning his head forward did impose limitations in his ability to lift, put on shoes, pull, hammer, saw, peel potatoes or carrots, wash his hair, do yard work, and wash dishes. Sometimes he needed help getting out of the bathtub. Hardesty indicated that the pain only permitted him to sleep two hours at a time. *See id.* at 127-32.

physician Dr. Sabita Sengupta.[3] She examined Plaintiff in September 2000 and issued a report, a range of motion findings chart, and an opinion of Plaintiff's work-related abilities. Dr. Sengupta noted that, according to Plaintiff:

> He [was involved in] a car accident in 1970, when he sustained injury in the neck. He has constant pain in the neck and upper shoulders, mostly right hand and right shoulder. He says that he has occasional muscle spasm in both sides of the neck. He states that he lost the curvature of the cervical spine and cannot rotate his neck. He cannot carry weight more than 5 lbs. [H]e has tingling in the hands, and both arms get numb, and sometimes he wakes up from sleep due to numbness. He says that tilting his head makes him dizzy.
>
> In 1993 he got hurt while carrying a box of burrito[s], which he dropped and he went to workmens' comp. for six months. He saw a chiropractor, who manipulated his neck and put him on traction. He was treated with pain medications and physiotherapy, which help him considerably.

*Id.* at 182. Her examination of Plaintiff revealed:

> He is very heavy set muscular built with central obesity. He is 5'6" tall and weighs about 226 lbs. BMI> 36. . . . Neck: short, no J.V.D. or carotid bruit. No thyromegaly. On examination of the cervical spine: No mid line tenderness present. No muscle spasm noted but paracervical stiffness present. Tenderness present in the upper Trapezious muscle to the right side. ***ROM slightly diminished*** in flexion and extension. In the upper extremity there is no muscle atrophy fasciculations. ***Good muscle strength and fairly good reflexes bilaterally symmetrical. Sensation preserved bilaterally.*** Good range of motion in both elbows and wrists. Forward elevation & abduction of both shoulders are slightly limited, which caused some discomfort in the neck and to the right side. ***He can make a fist bilaterally with good strength. He can oppose finders he can grasp and pinch***.

*Id.* at 183 (emphasis added).

---

[3] Although this doctor is sometimes referred to with masculine pronouns, Plaintiff refers to this doctor as female, and I do so as well. *See, e.g., Record* at 56, 191.

Dr. Sengupta noted the lab and x-ray findings. In her own words, she concluded that

> [b]ased on examination and impression [Hardesty] has problem in lifting heavy weight frequently more than 5 lbs due to degenerative disc disease of the cervical spine. Considering his severe obesity poorly controlled hypertension he become dizzy when he bends forward specially when getting up, and also he has some problem in walking or standing for prolonged period.

*Id.* at 184. She was of the opinion that Plaintiff could lift up to five pounds. From the way she filled out the form, however, it is unclear whether she believed he could do so only occasionally or frequently. *See id.* at 178. She also opined that Plaintiff's ability to sit was limited, but the extent of that limitation is also unclear. Dr. Sengupta further believed that Plaintiff was limited in his ability to reach overhead and, seemingly contrary to her examination findings, believed that he was also limited in his ability for fine manipulation. Finally, she found Hardesty could only stand or walk less than two hours in an eight-hour day. *Id.* at 178-79.

An agency physician, Dr. M. P. Finnegan, disagreed with Dr. Sengupta's conclusions. Focusing on Dr. Sengupta's physical findings, Dr. Finnegan was of the opinion that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and stand/sit/walk six hours in an eight-hour day. He further found Plaintiff had no limitations in pushing or pulling, but would "frequently" be limited in stooping, and "occasionally" limited in climbing, balancing, kneeling, crouching, and crawling. *See id*. at 186-89. Dr. Finnegan acknowledged that his opinion differed significantly from that of Dr. Sengupta. He explained that this conflict on the basis that

> Dr. Sengupta's report on CE gives a good picture of his function in the physical exam which differs from [her] conclusions about restrictions. [She] restricts him to less than sedentary level of function while all parameters of the physical exam point to a level of function that is much higher. Please refer to [my] discussion under exertional limitations [discussing Dr. Sengupta's report].

5

*Id.* at 191. The same day that Dr. Finnegan submitted his findings, the Administration initially denied Plaintiff's application. *See id.* at 80, 82, 192.

On reconsideration, Hardesty asserted that his pain was worsening and that the Administration should also consider anxiety and depression as disabling conditions. *Id.* at 141. Based on a review of Plaintiff's records, agency psychologist Dr. J. LeRoy Gabaldon,[4] found that Plaintiff's diagnosis of major depression did not meet Listing 12.04. *Id.* at 209. He assessed Plaintiff with mild restrictions in daily living activities, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation *Id.* at 216. His functional capacity form found that Plaintiff is not significantly limited in any area, except for a moderate limitation in concentration for extended periods. *See id.* at 220-21. Dr. Gabaldon explained that:

> Mr. Hardesty alleges to be impaired due to the extent of his mental problems. ***His assertion is not supported through available clinical evidence.*** He states that he has chronic discomfort due to his physical problems. As a result of his discomfort, he does have some problems with concentration. His daily activities are basic, he is social. There is no evidence of ongoing thought disorder or severe cognitive limitation. Mr. Hardesty has the capacity to understand/remember. He has some limited capacity to attend/concentrate. He has the capacity to be social and to adapt.

*Id.* at 222 (emphasis added). The Administration denied Plaintiff's application for reconsideration in February 2001. It did so for the same reasons as the initial denial regarding his asserted physical disabilities, and based on Dr. Gabaldon's findings regarding his asserted psychological disabilities. *See id.* at 81, 89-90.

---

[4] Dr. Gabaldon's credentials are not in the record. In other opinions I have noted that he is a psychologist. *See Gardom v. Barnhart,* CIV 03-699 KBM (*Doc. 16* at 7); *Chemereteff v. Barnhart,* CIV 01-1293 KBM (*Doc. 16* at 9).

When Plaintiff requested review by an ALJ, he added breathing problems as a disabling condition. *See id.* at 147, 149. At the close of the first hearing held in late March 2002, ALJ Cole informed Plaintiff and his attorney that he was "going to order an orthopedic evaluation and I'm going to order a breathing test because I don't think I got anything on breathing hardly at all in the record." *Id.* at 63.

Dr. Deborah H. Schenck examined Plaintiff on May 28, 2002. In relevant part, she assessed "severe degenerative disease of the cervical spine based on Plaintiff's x-rays." *Id.* at 265. Her examination revealed that:

> He had no difficulty filling out his paperwork, sitting, rising from a chair, or getting on and off the examination table. There was some ***evidence of symptom magnification*** in that the client coughed frequently and breathed heavily when not distracted but did not when distracted. He is obese and in generally poor physical condition indicative of a sedentary lifestyle.
>
> * * * * *
>
> Musculoskeletal: Rolling gait due to obese abdomen. ***Limited range of motion of the cervical spine.*** There is essentially no extension at all. Forward flexion is normal, lateral flexion and rotation is somewhat limited bilaterally. There is muscle guarding in the neck muscles bilaterally. ***Full range of motion of the shoulders with some crepitus. Upper extremity strength is somewhat decreased but equal bilaterally. Grip strength is equal bilaterally.*** There is obvious deformity and degenerative change that the left first MP joint. There is muscle guarding of a mild degree in the LS spine. Examination is otherwise normal. There is crepitus in the knees bilaterally with full range of motion.

*Id.* at 264-65 (emphasis added). She concluded that, "[b]ased on today's examination, this client is capable of only light work with no overhead work due to his degenerative joint disease of the cervical spine. His condition will likely continue to deteriorate." *Id.* at 265.

7

On July 10, 2002, ALJ Cole wrote Plaintiff's counsel to advise that he had "secured additional evidence that I propose to enter into the record.  I am enclosing copies of the consultative evaluations performed by [Dr.] Schenck . . . and the audiological evaluation dated May 6, 2002, by N. Hinojos, RRT for your review."  *Id.* at 153.  ALJ Cole further noted that Plaintiff could request a supplemental hearing based on the additional evidence and, in fact, held one in January 2003.  *See id.* at 65, 153.

Meanwhile, beginning in July 2002, Plaintiff's medical records contain notes concerning obtaining comparison x-rays and/or an MRI of the cervical spine.  *See id.* at 276, 307-08, 310.  The MRI was eventually conducted on November 14, 2002 and the results showed "bulging disk" at C3-4, and "herniated disks" located between C4-5 and C5-6 as well as at C6-7.  *Id.* at 304.  The physician who read the results stated his impression was:  "***[m]ultiple herniated disks,*** which are mostly to the left . . . ***causing spinal stenosis*** as evidenced by obliteration of the anterior and thecal space at these levels.  There also appears to be ***some thinning of the spinal cord*** at this level.  These findings are most marked at the C4-5 and 5-6 disk space."  *Id.* (emphasis added).

At the second hearing, ALJ Cole received Dr. R.E. Pennington's medical records, which contained the MRI results.  ALJ Cole entered them in the record, noting that the exhibit number of these records is 16F.  *See id.* at 67 (citing Exhibit 16F); *id.* at 302-10 (Exhibit 16F, with MRI results at page 304).

## III.  Analysis

### A.  *Subsequent Award Of SSI Benefits Is Irrelevant To Period At Issue*

Plaintiff contends that he became disabled in October 1996.  For disability purposes, his last insured status expired in March 2001.  For supplemental security income purposes, ALJ

8

Cole's March 10, 2003 decision marks the outside date for the relevant period.  Because Plaintiff applied for both disability and supplemental insurance benefits, the relevant periods overlap and my review is for the period from October 1996 to March 2003.  *See, e.g., Doc. 13* at 9; *Record* at 21.

After ALJ Cole issued his decision, Plaintiff filed a new application for supplemental security income benefits.  He was awarded benefits in September 2003, after the Appeals Council denied review in the matter before me.  *See Doc. 8; Record* at 5.  Plaintiff initially asserted the subsequent grant of benefits establishes a "presumption" that he has a "very meritorious claim" in the matter before me, but then took no issue with Defendant's assertion that the subsequent grant is irrelevant to the period at issue.  *See Doc. 10* at 7; *Doc. 14*.

In another social security appeal involving precisely the same argument, Magistrate Judge Smith rejected the notion that a subsequent grant of benefits has bearing on the ALJ's prior decision.  *See Fragua v. Barnhart,* CIV 02-1628 LCS (*Doc. 11,* filed 12/22/03, at page 9); *id.* (*Doc. 8* at page 7, plaintiff there asserted that because of subsequent award of benefits he "presumptively" had a "very meritorious claim").  I reach the same conclusion here, as have other courts.[5]

---

[5] *See Morgan v. Secretary of Health & Human Servs.,* 2002 WL 732091 at *9 (D. Del.) (following "the Eleventh Circuit [which] found that a subsequent grant of supplemental security benefits was not relevant when evaluating whether a prior denial of benefits was based on substantial evidence. *Wilson v. Apfel,* 179 F.3d 1276, 1279 (11th Cir. 1999)" and finding that approach consistent with binding precedent in holding that subsequent award of SSI benefits after date of ALJ's decision does not constitute "new" evidence, in part because "new" evidence "must concern the same relevant time period as in the ALJ's decision denying benefits"), *aff'd,* 49 Fed.Appx. 389 (3rd Cir. 2002); *see also, e.g., Marquez v. Barnhart,* CIV 01-872 KBM (*Doc.* 16, filed 8/14/02 at page 13, footnote 5; noting that under *Boone v. Apfel,* 189 F.3d 477, 1999 WL 668253 (10th Cir. 1999), to constitute "new evidence" requiring Appeals Council consideration under 20 C.F.R. § 404.970(b), the proffered evidence must be "chronologically pertinent," that is, "'the proffered evidence [must] relate to the time period for which the benefits were

### *B. Listing 1.04(A)*

At Step 3, ALJ Cole found that Plaintiff's "degenerative joint disease of the cervical spine does not meet or equal Listing Section 1.04, since there is no evidence of any nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis." *Record* at 14. The Listing ALJ Cole considered provides in relevant part:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. ***With***:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain*,* limitation of motion of the spine*,* motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss ***and***, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) (2003) (emphasis added). In support of his conclusion, ALJ Cole cited to "Exhibit 14-F," which contains Dr. Schenk's report and findings. Later in the opinion, ALJ Cole discussed the results of the MRI of the cervical spine ordered by Dr. Pennington. *See id.* at 16 (citing Exhibit 16-F, p. 3).

Plaintiff's challenges ALJ Cole's finding that Plaintiff's cervical condition failed to meet Listing 1.04(A).[6] *See Doc. 10* at 4. In response, Defendant counters that while Plaintiff has the general conditions to which Listing 1.04(A) applies, he fails to identify medical findings that

---

denied.'  *Hargis v. Sullivan,* 945 F.2d 1482, 1493 (10th Cir. 1991).").

[6] Plaintiff does not contend that he satisfied alternative ways of meeting the Listing under Subsection B (accompanying spinal arachnoiditis) or Subsection C (accompanying lumbar spinal stenosis), both of which also require the specified severe results of those conditions.

match all of the criteria of the relevant Listing. Defendant reads Listing 1.04(A) to require a showing of five things:

1. a condition such as degenerative disc disease or spinal stenosis;

2. the condition results in compromise of a nerve root or the spinal cord;

3. nerve root compression characterized by neuro-anatomic distribution of pain;

4. nerve root compression characterized by limitation of motion of the spine; and

5. nerve root compression characterized by either atrophy or muscle weakness, also accompanied by sensory or reflex loss. (If the condition involves the lower back, the atrophy or weakness accompanied by sensory or reflex loss must be reflected in a "positive" straight-leg raising test.).

I concur that a plain reading of that regulation requires those five findings in order to meet the disability listing.

Indeed, "[Plaintiff] has the burden at step three of demonstrating, through medical evidence, that his impairments 'meet *all* of the specified medical criteria' contained in a particular listing." *Riddle v. Halter,* 10 Fed. Appx. 665, 666 (10th Cir. 2001) (emphasis original). *Riddle* quotes and emphasizes a portion of the Supreme Court's opinion in *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990). In that same passage, the *Zebley* Court further notes that "[a]n impairment that manifests *only some* of those criteria, *no matter how severely, does not qualify,*" and it cites the discussion of general Listings analysis in Social Security Ruling ("SSR") 83-19 in support. *Id.* (emphasis added). The discussion of general Listings analysis portion of the Ruling cited by *Zebley,* in turn, also provides that "[a] finding that an impairment meets the listing *will not be justified on the basis of a diagnosis alone.*" *SSR 83-19,* 1983 WL 31248 at * 2 (1983)

(emphasis added).[7]

Plaintiff does not appear to take issue with this reading of what the relevant Listing requires. Rather, Plaintiff's contends that the MRI shows he does have "nerve root compression" and "stenosis" and, therefore, ALJ Cole's conclusion that "there is no evidence of any nerve root compression" is plainly wrong and grounds for reversal or remand. *See Doc. 10* at 4. I disagree.

First, the MRI does not find that Plaintiff has "nerve root compression." It states that Plaintiff's herniated discs are causing spinal stenosis and that there "appears" to be "some thinning of the spinal cord." The MRI brings him within the ambit of Listing 1.04 because Plaintiff's medical records plainly show that he suffers from degenerative cervical disc disease, and the MRI suggests that this has "compromised" his spinal cord by causing "thinning." At best then, these medical findings only take Plaintiff past the first two required criteria.

Second, Plaintiff argues that his medical records are "replete" with complaints of pain his neck, back, shoulders, and arms and that these complaints, coupled with Dr. Sengupta's range of motion findings, demonstrate the degree of limitation required to meet or to "equal" Listing 1.04(A). *See Doc. 10* at 4; *Doc. 14* at 3. However, like the MRI, these records also do not find or diagnose "nerve root compression." Plaintiff's description that he has "pinched nerves" is not sufficient to establish a disability under the Listings. *E.g., Bernal v. Bowen,* 851 F.2d 297, 300

---

[7] The Administration, "rescinded" SSR 83-19 and other Rulings that deal with the evaluation of child disability claims because *Zebley* held the Administration's differential treatment of adults and children was contrary to statute. *See SSR 91-7c,* 1991 WL 231791 at *1. As observed above, however, the issue before the *Zebley* Court did not involve the general Listings analysis as applied to adults, and *Zebley* as well as later decisions stand for the proposition that all of the criteria of a Listing must be met. Furthermore, the general principle that each Listings criteria must be met and that a diagnosis of a Listed impairment alone will not suffice, are codified in current regulations. *See* 20 C.F.R. § 404.1525(d) ("We will not consider your impairment to be one listed . . . solely because it has the diagnosis of a listed impairment. It must also have the findings shown in the Listing of that impairment.").

(10th Cir. 1988).

Furthermore, even if these medical records were sufficient to establish nerve root compression characterized by the requisite pain and limited range of motion, they do not establish the requisite atrophy and weakness accompanied by sensory or reflex loss. None of the medical records do so and Dr. Sengupta's report, consistent with Dr. Schenck's, actually finds to the contrary. Both doctors found some limited range of motion and weakness but sensation and reflexes intact and that Plaintiff was able to grip.

At the hearing, Hardesty testified that he was able to engage in fewer activities than he indicated on the initial daily activities questionnaire. Nevertheless, he testified that he was still able to feed his animals, prepare small meals, do some laundry and driving, and pace and watch television. *Record* at 42-45. In contrast, by its definitional terms, the Listing is concerned with disorders of the musculoskeletal system that result in "extreme" limitations in the ability to use both arms.[8] Thus, Plaintiff fails to meet his burden establishing that he meets Listing 1.04(A).

In addition, an ALJ at Step 3 is "required to discuss the evidence and explain why he found that appellant was not disabled." *Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir. 1996). A mere summary conclusion that a claimant's impairment does not meet or equal a listing is insufficient because "[s]uch a bare conclusion is beyond meaningful judicial review." *Id.* However, ALJ Cole's conclusion that there is no evidence of nerve root compression is supported by substantial evidence. Furthermore, when the conclusion is put in context of the rather

---

[8] *See* 20 C.F.R. § 404.1.00 (A)(2)(b) (requires inability to perform find and gross movements effectively for at least twelve months, which "means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability tin independently initiate, sustain, or complete activities . . . examples . . . include . . . inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene . . .").

comprehensive discussion of Plaintiff's x-rays, medical records, MRI results and consultative examining physician findings later in the opinion, I cannot conclude that his Step 3 finding is "conclusory."[9] To remand and require ALJ Cole to further explain the basis of his findings would be an empty exercise.

Finally, to the extent that Plaintiff is arguing his condition is "equivalent" to Listing 1.04(A), the claim fails. "The 'equivalency' analysis has no use where the alleged impairment matches [that is degenerative disc disease resulting compromise of the spine] one of those listed in the regulations." *Carriere v. Apfel,* CIV 97-986 JP/WWD (*Doc. 14* at page 5, citing *Brainard v. Secretary of Health & Human Servs.,* 1994 WL 170783 at *2 (10th Cir. 1994)). In other words, if the Listings specifically address a condition, then the equivalency alternative is "not relevant." *Doc. 13* at 5 (and attached *Brainard* opinion). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment,

---

[9] In *Clifton,* a panel of this court reversed the district court and remanded the case for additional proceedings when the ALJ made 'such a bare conclusion' that it was effectively 'beyond meaningful judicial review.'... However, as we explained then, our decision was based on the fact that 'the ALJ did not discuss the evidence or his reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings; he merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment.'... This is not the case before us now. Here, the ALJ went to great lengths to identify the relevant listings, discuss the evidence (including objective medical reports that discounted the severity of Mrs. Corber's impairments) and follow the appropriate procedure for documenting the Psychiatric Review Technique Form ratings. These findings are far from the type of summary conclusion we rejected in *Clifton,* and, therefore, are not beyond any meaningful judicial review.

*Corber v. Massanari,* 20 Fed. Appx. 816, 819 (10th Cir. 2001).

14

he must present medical findings equal in severity to **all** the criteria for the one most similar listed impairment." *Zebley,* 493 U.S. at 531; *see also* 20 C.F.R. § 404.1526(a) ("If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal."). Thus, for the reasons above, an "equivalency" argument is unavailing as well.

### *C. Credibility*

In determining that Plaintiff can still do limited light work despite his limitations, *see* 20 C.F.R. § 404.1545(a), ALJ Cole gave more weight to Dr. Schenk's opinion than Dr. Sengupta's, and found Plaintiff's testimony exaggerated and not fully credible, *see Record* at 17. In his memorandum in support, Plaintiff makes the conclusory assertion that ALJ Cole erred in finding him not credible, saying that if Dr. Sengupta's conclusions about his residual functional capacity are "credible," then medical evidence supports Plaintiff's assertions. *See Doc. 10* at 5. In his reply, Plaintiff focuses on Dr. Sengupta's opinion and asserts that ALJ Cole erred in disregarding her opinion about his functional restrictions. *See Doc. 14* at 1-3. Specifically, Hardesty contends that Rulings 96-5p and 96-6p require an ALJ to consider the opinion of an examining consulting physician, treating it as expert opinion, and explain the weight given to that expert opinion. *See id.* at 1-2.

I fail to see how ALJ Cole erred in this regard, since he did precisely what Plaintiff proclaims the Rulings require him to. That is, ALJ Cole "considered," in detail, both Dr. Sengupta's findings and opinion about Plaintiff's abilities along with all of the other medical evidence and explained why he gave it little weight. *See Record* at 16-17.

Plaintiff appears to argue that an ALJ may not give more weight to a nonexamining

15

consulting source than an examining source under the regulations. However, he cites a definitional section as authority for this proposition. *See Doc. 14* at 2 (citing 20 C.F.R. § 404.1502). That regulation defines what is meant by nonexamining medical source, nontreating medical source, and treating medical source. It does not discuss the weight to be assessed among different nontreating sources. Moreover, ALJ Cole weighed Dr. Sengupta's findings vis-a-vis the findings of another consulting ***examining source*** – Dr. Schenck. Thus, I find that ALJ Cole applied the correct legal standards.

Furthermore, ALJ Cole's discussion and analysis engaged in precisely the type of inquiry that he is required to undertake, since the ALJ is responsible for resolving conflicts in the medical evidence.[10] The ALJ gave more weight to Dr. Schenk's residual functional capacity findings because her conclusion "is better supported by the objective findings and more consistent with the record as a whole." *Record* at 17. In contrast, "Dr. Sengupta's functional capacities evaluation is not consistent with the relatively mild objective findings in [her] own physical examination." *Id.*

---

[10] *E.g., Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 801 (10th Cir. 1991) ("As to the medical evidence, not all of the nine doctors who saw Casias were in complete agreement about either her medical condition or her prognosis. This case thus presents 'the not uncommon situation of conflicting medical evidence,' a situation in which '[t]he trier of fact has the duty to resolve that conflict.' *Richardson v. Perales,* [402 U.S. 389, 399 (1971)]. To bolster her position, Casias cites selectively to the medical opinions and observations of four of the doctors, ignoring the other five. The ALJ, however, considered all of the medical evidence as well as the claimant's own testimony before concluding that Casias retained sufficient residual functional capacity to perform her past relevant work. We find no error here."); *Galdean v. Barnhart,* 46 Fed. Appx. 920, 924 (10th Cir. 2002) (affirming decision from this district) ("In other words, the two [apparently consulting examining] psychologists agreed on certain things: they both felt, for instance, that Mr. Galdean could follow basic work rules and understand simple job instructions, and that he was capable of interacting appropriately with co-workers and supervisors. But they differed, too. Most significantly, Dr. Enfield did not share Dr. Traweek's view that Mr. Galdean would face 'considerable' difficulties in handling job-related stresses, provided, of course, that the job entailed relatively simple tasks. Nor did he agree that Mr. Galdean's depressive symptoms would pose a safety risk. . . . T his is not to say that Dr. Traweek is wrong, and Dr. Enfield correct. It is to suggest, however, that resolving such a conflict in the medical evidence is a task allocated not to this court but to the ALJ.").

On the record before me, there is no basis for finding that this rationale is unsupported by substantial evidence.

Without any medical record from treating physicians that impose restrictions on Plaintiff, and because ALJ Cole properly gave less weight to Dr. Sengupta's opinion about residual functional capacity, the underpinnings of Plaintiff's credibility argument falls away. Moreover, ALJ Cole's opinion specifically discusses the aspects of Plaintiff's testimony and daily activities contradicting Hardesty's conviction that he is unable to perform any sort of work and which constitute substantial evidence supporting the ALJ's decision. I thus find no error in the ALJ's credibility assessment.

### D. *Treating Sources For Plaintiff's Depression*

On his wife's recommendation, Plaintiff was seen for depression to the Carlsbad Mental Health Association. Hardesty relies on the GAF score of 45 that he was assessed by a social worker at intake. Plaintiff contends that this is a "treating" physician report and therefore entitled to conclusive weight on the issue of depression. He argues that ALJ Cole erred by disregarding the GAF finding and instead relying on a Psychiatric Review Technique by an agency physician. *See id.* at 14. As best I understand, Hardesty further advances that ALJ Cole should have ordered a consultative examination or recontacted the Association to clarify Plaintiff's condition.

These arguments are utterly without merit for the reasons stated in Defendant's response, which I incorporate herein by reference. *See Doc. 13* at 7-9. In short, the GAF score was not issued by a "treating" physician as defined by the regulations. Moreover, Plaintiff, who started therapy in October 2000 approximately four months after filing his application, was "doing well" by his very next visit, continued doing well and was stable throughout the rest of his visits. In

fact, Plaintiff started a program of Tai Chi and of doing more things around the house,. He discontinued therapy just a little over a year later. *See, e.g., Record* at 193-99, 224-39.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 9)* is DENIED, and the decision of the Commissioner is affirmed. A final order will enter concurrently herewith.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.